**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION**

| | |
|---|---|
| **ROBERT R. BELL, JR., et al.,** | |
| Plaintiffs, | CASE NO. 1:11-CV-00181 |
| vs. | |
| **US XPRESS, INC.** | UNITED STATES DISTRICT JUDGE CURTIS L. COLLIER |
| Defendant. | |

---

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE CLASS ACTION
SETTLEMENT, FOR AWARD OF ATTORNEYS' FEES, EXPENSES AND CLASS
REPRESENTATIVE SERVICE AWARD**

---

Plaintiffs, Robert R. Bell, Jr., Bernard Fentress and the putative class move for an Order

approving the April 5, 2013 Stipulation of Settlement (Doc. 58-1) as fair, reasonable and adequate,

and authorizing disbursement of the Settlement Fund to the Class Members who have not opted

out of said settlement.

A Memorandum in Support is attached hereto and incorporated herein.

Respectfully Submitted,

O'TOOLE, MCLAUGHLIN, DOOLEY &
PECORA

By: /s/ Matthew A. Dooley
Anthony R. Pecora (0069660)
Matthew A. Dooley (0081482)
5455 Detroit Road
Sheffield Village, Ohio 44054
Telephone (440) 930-4001
Fax: (440) 934-7208
Email: mdooley@omdplaw.com
apecora@omdplaw.com and

and

CONSUMER LITIGATION ASSOCIATES, P.C.
Leonard A. Bennett (Va. Bar No. 27523)
12515 Warwick Boulevard
Newport News, Virginia 23606
Tel:            (757) 930-3660
Fax:           (757) 930-3662
Email:        lenbennett@clalegal.com
*Counsel for Plaintiffs and the putative class*

## MEMORANDUM IN SUPPORT

### I.    BACKGROUND

On July 8, 2011 Named Plaintiff Robert Bell, Jr. ("Bell") commenced this civil action against U.S. Xpress, Inc. ("Defendant" or "USX") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* (Doc. 1). The action was brought by Bell on behalf of himself and all other similarly situated individuals (collectively, "the Class" or "Class Members") who applied for employment with USX and about whom USX obtained a consumer report for employment purposes between July 8, 2009 and October 27, 2011 (the "Class Period"). The original complaint was subsequently amended on September 30, 2011 to add Bernard Fentress as an additional Named Plaintiff.

In the Amended Complaint, Named Plaintiffs alleged that USX violated certain provisions of the FCRA in connection with its use of consumer reports. Specifically, Named Plaintiffs alleged that USX willfully violated (i) 15 U.S.C. § 1681b(b)(2)(B) by failing to provide Class Members with required statutory disclosures prior to obtaining consumer reports for employment purposes; and (ii) 15 U.S.C. § 1681b(b)(3)(B) by failing to provide Class Members with required statutory notices within 3 business days of taking adverse employment action based in whole or in part on a consumer report. USX denied Named Plaintiffs' allegations and maintains that it did not violate the FCRA in any way.

Following the filing of the civil action, USX sought to dismiss the litigation, which Named Plaintiffs vigorously opposed. Thereafter, the Parties engaged in written discovery, which included documents and data regarding the putative class members and the various forms and oral communications provided to job applicants. Likewise, Named Plaintiffs provided documents to

USX, which detailed the factual support for the allegations in the civil action. After reviewing the information and assessing their respective liabilities, the Parties agreed to mediation with Linda Singer at the JAMS office in Washington, D.C. After an arduous mediation process, the Parties reached a settlement agreement. The details of this settlement were first presented to the Court via the Parties' Stipulation of Settlement filed April 5, 2013 (Doc. 58-1), which was preliminarily approved on April 7, 2014. (Doc. 59).

## II.    **THE PROPOSED SETTLEMENT**

The provisions of the Stipulation of Settlement provide for cash disbursements to the class, incentive awards to the Named Plaintiffs, and attorney fees within the acceptable range for matters of this type. The salient terms are as follows:

- USX agreed to pay a total of Two-Million-Seven-Hundred-Fifty-Thousand Dollars ($2,750,000.00) (the "Settlement Funds"), from which the following Class Members are entitled to receive an equal pro rata share after payment of costs of notice and administration, Incentive Awards, and attorneys' fees:

> All consumers residing in the United States who applied for truck driving positions with USX via facsimile, telephone, electronic mail, internet, or other non-in-person means, and for whom USX procured a consumer report.

- The cost of notice and administration of the settlement shall be paid from the Settlement Funds;

- In the event that settlement checks mailed to Class Members are returned as undeliverable or otherwise not cashed before becoming stale or void, and/or that the Settlement Funds are not completely distributed, the remaining sum shall be distributed to a *cy pres* beneficiary selected by Class Counsel and Defendant's Counsel, subject to the Court's approval.

- After attorney fees and expenses and administrative costs are removed from the Settlement Funds, each of the 85,362 Class Members it is estimate that Class Members will receive a payout of approximately $20.00.[1]

---

[1] This net calculation assumes an attorney fee award of one-third (1/3) of the Settlement Fund, class administration costs of $200,000, incentive awards of $30,000 and a class size of approximately 85,352 truck drivers nationwide.

## III.   ARGUMENT

### A.   The Final Approval Procedure

Settlement is favored, particularly in class actions and other complex cases where substantial recourses can be conserved by avoiding the time, cost and rigors of prolonged litigation. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981); Albert Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("By their very nature, because of the uncertainty of outcome, difficulties of proof, length of litigation, class action suits lend themselves readily to compromise.") Recognizing that complex litigation can be "notoriously difficult and unpredictable," in the absence of "fraud or collusion," settlements in complex litigation are not to be disturbed. *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).

Under the Federal Rules of Civil Procedure, parties proposing the settlement of the claims of a certified class must obtain the Court's approval. *See* Fed. R. Civ. P. 23(e)(1)(A).  Rule 23(e) provides in relevant part:

> [t]he court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, of compromise is fair, reasonable and adequate.

The three-step process for approval of class action settlements in federal court is described in the *Manual for Complex Litigation* §§ 21.632-635 (4th ed. 2004) ("*Manual*") which provides the following procedure:

1.   [p]reliminary approval of the proposed settlement at an informal hearing;

2.   [d]issemination of mailed and/or published notice of the settlement to all affected Class members; and

3.  [a] "formal fairness hearing", or final approval hearing, at which *class members* may be heard regarding the settlement, and at which presentations concerning the fairness, adequacy, and reasonableness of the settlement is presented.

*See also Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983).

Here, the Court has already granted preliminary approval of the proposed settlement, and the Settlement Administrator has completed dissemination of the settlement notice to affected class members. *See* Declaration of Risa Neiman (Exh. A.). Accordingly, the Court need only now determine whether the settlement is fair, reasonable, and adequate. *Manuel* at §§ 21.632-35.

## B.  The Factors to be Considered by the Court

In evaluating whether a class action settlement is fair, reasonable and adequate, the Court should consider the following factors: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Granada*, 962 F.2d at 1205; *Vukovich*, 720 F.2d at 922-23. A settlement is "presumptively reasonable" once preliminarily approved and "[a]n individual who objects, consequently, has a heavy burden of demonstrating that the [settlement] is unreasonable." *Bronson v. Bd. of Edu.*, 604 F.Supp. 68, 71-72 (S.D. Ohio 1984). Speaking on this subject, the Sixth Circuit has held that the question for the Court is not which party is correct or has the better argument, but is instead whether the parties are resolving a legitimate legal and factual disagreement. *Int'l Union, United Auto, Aerospace, and Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007). In its evaluation, the district court has "wide discretion." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). As the Sixth Circuit has explained:

> [N]o court of appeals, to our knowledge, has demanded that district courts invariably conduct a full evidentiary hearing with live

testimony and cross-examination before approving a settlement. Our court, and several others, have instead deferred to the district court's traditionally broad discretion over the evidence it considers when reviewing a proposed class action settlement.

*UAW v. GMC*, 497 F.3d 615, 636 (6th Cir. 2007); *Officers for Justice*, 688 F.2d at 625 (fairness hearing should not be turned into a trial or rehearsal for trial on the merits).

### C. The Settlement is Fair, Reasonable, and Adequate as a Whole

#### 1. There is No Risk of Fraud or Collusion

Lasting over a year and a half, this action was adversarial from inception through settlement. Only after studious document review, dispositive motion practice, discovery and lengthy negotiation was settlement attainable. Counsel for both parties vigorously litigated to secure the most desirable outcome for their respective clients, and an agreement was ultimately reached only with the assistance of mediator Linda Singer. Notably, the scope of the class size and resulting gross settlement fund is reflective of these facts.

In assessing the first factor, Judge Beckwith of the United States District Court for the Southern District of Ohio stated: "[t]he participation of an independent mediator in the settlement negotiations virtually assures that the negotiations were conducted at arm's length and without collusion between the parties." *Hainey v. Parrot*, 617 F. Supp.2d 668, 673 (S.D. Ohio 2007) (Beckwith, J.) (citing *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2005) and *In re Toys R Us Antitrust Lit.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000)). Here, agreement required an all-day hard fought mediation with Linda Singer, a mediator with over 30 years of experience.

Finally, in evaluating possible fraud or collusion, a court should address whether the agreement is the result of either overt misconduct by the negotiators or improper incentive of certain class members at the expense of others. *Greenberg v. Proctor & Gamble Co. (In re Dry*

7

*Max Pampers Litig.*), 724 F.3d 713, 718 (6th Cir. 2013); *see also Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). Here, no Class Members have filed objections with the Court out of the roughly 86,500 total Class Members. Moreover, there is no competing litigation pending in any other court. Indeed, the settlement was accomplished through informed, good faith, extensive, hard fought and arm's-length negotiations resulting in all class members Class Members who do not opt out of the action receiving an appropriate statutory damage recovery for the alleged FCRA violations.

### 2. The Complexity, Expense and Likely Duration of Continued Litigation

Generally, "settlement avoids the costs, delays, and multitude of other problems" inherent in complex class action litigation. *See In re Telectronics Pacing Sys.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001). Unless the settlement is "clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *National Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting *Newberg*, § 11:50 at 155). Simply put, it is proper "to take the bird in hand instead of a prospective flock in the bush." *DIRECTV*, 221 F.R.D. at 526 (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 596, 624 (D. Colo. 1974)).

After attorney fees and expenses and administrative costs are removed from the Settlement Funds, each Class Member will receive a payout of approximately $20.00.[2] While this number appears low at first glance, it is a strong recovery compared to the number of Class Members benefitted and the risk, complexity, and expense of litigating this case through trial and subsequent appeals. Unlike many class settlements, this settlement does not require Class Members to participate in a claims process in order to receive monetary relief, which often result in payouts to

---

[2] This net calculation assumes an attorney fee award of one-third (1/3) of the Settlement Fund, class administration costs of $200,000, incentive awards of $30,000 and a class size of approximately 85,352 truck drivers nationwide.

only 10-15% of the class. *See, e.g.*, *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 404 (D. Mass. 2008) (noting that where settlements require class members to submit claims, response rates are typically around 10-15% and rarely exceed 50%). Here, the Class is compromised almost entirely of over-the-road truck drivers, who are often away from home and otherwise unable to complete and mail a claim form to receive a settlement check. Class Counsel negotiated a departure from such a process in order to increase the likelihood that Class Members would receive a tangible benefit. Had the Parties agreed to a claims process, the benefit to participating Class Members would have likely equaled $125.00 after deductions for notice and administration costs, and attorney fees. While admittedly a larger amount, the mere fact that every Class Member will automatically receive a check is more remarkable.

The policy favoring the settlement of complex cases is particularly true in the context of FCRA litigation. The FCRA is not merely a "complex statutory scheme," but one that has been said to contain "almost incomprehensibly complex provisions" and "esoteric strictures." *See Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 440 (D.N.J. Dec. 7, 2010); s*ee also Narog v. Certegy Check Servs.*, 759 F. Supp. 2d 1189, 1194-95 (N.D. Cal. 2011). Consequently, individuals not only rarely pursue their claims, they can be unaware of them if they never even receive notice.

Here, if the settlement were rejected, Bell, Fentress, and all others similarly situated would bear the burden of proving that USX's actions were committed willfully. *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-57 (2007) (willfulness is tantamount to a knowing or reckless violation of the statute). Proving willful violations can be very expensive, including more intensive discovery, and would likely take years to resolve. If not resolved by mutual agreement, this case will surely proceed to trial, and probable appeal, and will involve further expense and judicial resources. The trial could last several weeks and involve the introduction of voluminous documentary and

deposition evidence and strenuously contested motions, all at great expense to both the Court and the Class. Avoiding this result and avoiding prolonged, endless litigation in this matter weighs strongly in support of approval of the Settlement. *See DIRECTV*, 221 F.R.D. at 527.

### 3. The Amount of Discovery Conducted by the Parties

To ensure that plaintiffs have had access to sufficient information to evaluate their case and to assess the adequacy of a proposed settlement, a court must also consider the stage of the proceedings and the extent of discovery conducted. *See In re Telectronics Pacing Sys.*, 137 F. Supp. 2d at 1015; *see also Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000). Here, the course of discovery in this matter justifies approval. The parties exchanged and reviewed ample documents before attempting to reach a settlement. *See DIRECTV*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.")

After fully briefing USX's Motion to Dismiss (*see* Doc. 22-23), Parties agreed to engage in private mediation. Accordingly, Parties filed a Joint Motion to Stay the Case Pending Mediation (Doc. 44), which was granted on September 12, 2012 (Doc. 45). In preparation for mediation, Parties engaged in appropriate discovery exchanging hundreds of documents to determine class size and both parties' respective theories. Reviewing these documents provided invaluable insight into USX's hiring process and the evolution of USX's use of consumer reports for employment purposes apprising both Parties of all relevant legal and factual issues. As a result, the Parties engaged in a productive mediation in Washington, D.C. on February 11, 2013 that ultimately led to a detailed settlement agreement.

### 4. The Likelihood of Success on the Merits

The uncertainty of success on the merits is a factor which a court must weigh in favor of approving settlement. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 121093, at *35 (N.D. Ga. Oct. 20, 2008) ("…certainty of recovery clearly outweighs Lead Plaintiffs' uncertain prospects of success through continued litigation. This factor therefore favors approval of the settlement.")

Here, the settlement provides for guaranteed monetary relief for all affected Class Members. As explained above, in order to achieve this same result at trial, the Class Members would have to demonstrate that USX willfully violated the FCRA – *i.e.*, USX took action involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68. If Plaintiffs were unsuccessful in establishing willfulness, the Named Plaintiffs' claims on behalf of the Class Members would fail and they would not be entitled to any monetary relief. In light of this, duplicating the guaranteed payments to members of the Preliminary Settlement Class is uncertain. As such, the uncertainty of ultimate success on the merits weighs in favor of approval of the proposed settlement.

### 5. The Opinions of Class Counsel and Class Representatives

In evaluating the adequacy of the terms of the settlement, the trial court is entitled to – and should – rely upon the judgment of experienced counsel for the parties. *See DIRECTV*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation") (internal quotations and citations omitted). The basis for such reliance is that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

Here, Class Counsel are seasoned practitioners with extensive FCRA litigation experience. With first-hand knowledge regarding settlements in similar FCRA cases, Class Counsel believe the settlement is fair, reasonable, and adequate. *See Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 852 (E.D. La. 2007). Based on their collective experience, understanding of the strengths and weaknesses of the case and analysis of the discovery produced to date, Class Counsel recommend that the Court approve the settlement. Finally, Named Plaintiffs have also requested that the settlement be approved as their interests coincide with the interests of the Class.

### 6. The Reaction of Absent Class Members

In evaluating a proposed class action settlement, the Court should look to the reaction of the class members. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001). Here, approximately 85,362 were provided notice of the proposed Settlement by direct mail. *See* Declaration of Risa Neiman (Exh. A). To date, no Class Members have filed objections with the Court and only seven (7) Class Members asked to opt out (.008% of the total Class). (*Id.*) The overwhelming silence from Class Members, lack of objectors and small number of opt-outs demonstrates that the settlement is adequate. *In re Delphi Corp. Sec. Litig*., 248 F.R.D. 483, 488-89 (E.D. Mich. 2008); *In re Cardizem Antitrust Litig*., 218 F.R.D. 508, 527 (E.D. Mich. 2003); Newberg on Class Actions, §11.48.

### 7. The Public Interest

Lastly, the Court must consider the public interest in approving the settlement. *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir. 2004) (there is an overriding public interest in settling class action litigation, and it should therefore be encouraged). The settlement of this matter brings closure to over two years of litigation, and the proceedings that gave rise to it bring relief to job applicants nationwide.

### D. Notice to the Class was Reasonable and Satisfied Due Process

In class actions certified under Rule 23(b)(3), notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that no class action may be dismissed or compromised without court approval, preceded by notice to class members. Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that: (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litig.* § 21.312 (4th 2004).

Here, the class list was compiled from information provided by HireRight Solutions, Inc. ("HireRight") (the consumer reporting agency from whom USX procured class members' consumer reports), USX, and the Settlement Administrator. Together, data from multiple sources was cross-referenced to identify unique class members with maximum precision and then to obtain the most recent address information available. The addresses were then checked against the United States Postal Services' National Change of Address ("NCOA") database. Once the class list was compiled, notice was provided by direct mail, postage pre-paid. The professional class action administrator generated and mailed the notices. *See* Declaration of Risa Neiman (Exh. A). As of August 7, 2014:

- Original mailing took place on May 28, 2014 to 85,362 class members;

- 21,554 of the 85,362 notices were returned as undeliverable;

13

- The undeliverable notices were then processed through LexisNexis Accurint,[3] which generated 16,958 new addresses. Notices were resent to these new addresses.

- Of these 16,958 resent notices, 3,078 were returned as undeliverable.

- After further re-mailing, the Settlement Administrator was able to locate and confirm delivery of notices to 82,120 of 85,362 class members – a 96.2% delivery rate

*See* Declaration of Risa Neiman (Exh. A).

There is no statutory or due process requirement that all class members receive actual notice by mail or other means; rather, "individual notice must be provided to those Class Members who are identifiable through reasonable effort." *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 175-76 (1974). Rule 23(e) gives the Court "virtually complete" discretion as to the manner of service of settlement notice. *See, e.g.*, *Franks v. Kroger Co.*, 649 F.2d 1216, 1222-23 (6th Cir. 1981); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985) (direct notice satisfies due process).

As a backstop, the Settlement Administrator also established a website, www.classactionusx.com containing copies of the class notice. Internet email and website communications are routinely included in notification requirements of class action settlements. *See Browning v. Yahoo! Inc.*, 2006 WL 3826714 (N.D. Cal, 2006); *Farinella v. Paypal, Inc.*, 2009 WL 1211912 (E.D.N.Y., 2009); *Choicke v. Slippery Rock Univ.*, 2007 WL 2317323 (W.D. Pa., 2007); *Todd v. Retail Concepts, Inc.*, 2008 WL 3981593 (M.D. Tenn. 2008). USX also served notice of the settlement upon the relevant state and federal authorities as required by the Class Action Fairness Act of 2005, 28 U.S.C. §1715. Class Counsel has not received any correspondence or objections from state attorneys general or any other noticed authorities.

### E. Approval of the Request for an Incentive Payment, Attorneys' Fees, and

---

[3] Accurint has access to more than 34 billion public and proprietary records compiled from more than 10,000 data sources in order to deliver accurate and relevant information. *See* LexisNexis Accurint, www.accurint.com, last visited Aug. 13, 2014.

14

### Reimbursement of Expenses is Appropriate

Consistent with the Stipulation of Settlement, Class Counsel request an award of attorney fees and expenses as a percentage of the common fund, to be capped at a gross percentage of one-third of the actual common fund paid by USX to and for the benefit of the class. Because the total Settlement Fund is $2.75 million ($2,750,000.00), the full fee and cost recover requested is $916,667.00. This sum includes all costs and expenses associated with the case and incurred by two law firms and six attorneys that litigated this case on behalf of the Class. It is a fee that is calculated against real dollars and not a purely theoretical claims fund. Every dollar leaves USX and is paid to and for the benefit of the class – no Settlement Funds revert back to USX.[4]

The "common fund" doctrine has long been recognized in the Sixth Circuit. *See Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993) ("In this circuit, we require only that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances.") As this Court previously concurred, "the lodestar method is cumbersome; the percentage-of-the-fund approach more accurately reflects the result achieved; and the percentage-of-the-fund approach has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or 'churn' cases." *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 2:12-cv-83, 2014 WL 2946459, at *1 (E.D. Tenn. Jun. 30, 2014) (Collier, J.) *quoting In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003). The Supreme Court has also consistently calculated attorney fees on a percentage-of-the-fund method. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-67 (1939); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478-79 (1980); *Blum v. Stenson,* 465 U.S. 886, 900 n. 16 (1984); *see also Report of the Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common

---

[4] Counsel also does not attempt to monetize or calculate attorney fees on a percentage of the benefit associated with various FCRA process changes undertaken by USX during the litigation.

fund cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage of recovery method in a common fund case, even when lower federal courts began using the lodestar approach in the 1970s. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.

In this case, the percentage of the fund requested is well within the range of contingency percentages awarded in similar class cases, which generally fall between 25% and 40%. There is no reason to downwardly depart in this case. "Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery." 4 Newberg on Class Actions § 14:6 (4th ed.). *See also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third").

This range is also consistent with fee percentages awarded in other class cases in this District and Circuit. *See, e.g.*, *In re Skelaxin*, 2014 WL 2946959 (awarding 1/3 of common fund); *In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) (awarding 33.33% of settlement amount); *Hall, et al. v. Vitran Express, Inc.*, N.D. Ohio Case No. 1:09-CV-00800 (2012) (FCRA class settlement awarding 30% of the common fund); *Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933 (N.D. Ohio Mar. 8, 2010) (33% of settlement amount).[5] *Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-CV-1061, 2013 WL 2295880, at *6 (S.D. Ohio May 24, 2013) (FCRA class settlement awarding 33% of the common fund). The Court need only then evaluate the reasonable of the contingent fee award.

---

[5] It is also important to note that Class Counsel's requested percentage is inclusive of costs and expenses incurred in the litigation and will not further reduce the Settlement Fund seeking reimbursement for such expenses.

In considering the reasonableness of a fee award, the Court considers six factors: (1) the value of the benefits rendered to the class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel on both sides. *See, e.g.*, *Ramey v. Cincinnati Enquirer, Inc*., 508 F.2d 1188, 1196 (6th Cir. 1974).

### 1. The Value of the Benefit Rendered to the Class

"District courts in this Circuit widely regard the first *Ramey* factor as the most important." *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 764-65 (S.D. Ohio 2007). As explained above, this case alleges that USX failed to make certain disclosures required by the FCRA when using consumer reports for employment purposes – namely that the applicant has a right to a free copy of the report with 60 days of USX's procurement, and a right to dispute the accuracy or completeness of the report directly with the consumer reporting agency. *See* 15 U.S.C. §§ 1681b(b)(2)(B) and 1681b(b)(3)(B). Unlike traditional credit reports, which consumer reporting agencies must annually provide free of charge upon request, the reports used by USX contain employment, driving and criminal histories, which a consumer reporting agency may charge a fee to provide to a consumer.[6] *See* http://www.consumerfinance.gov/askcfpb/search/?selected_facets=tag_exact%3Acredit+report+cost. ("By law, a credit reporting company can charge no more than $11.50 for a credit report.") The limited exception to a *free* copy triggers when a DOT-regulated trucking company like USX procures and then uses such a report to determine eligibility for employment. *See* 15 U.S.C. §§

---

[6] Class Members were the subject of consumer reports provided to USX by companies like HireRight Solutions, Inc. and DriverFACTS, both serving most major trucking companies in the United States. *See* http://www.hireright.com; *see also* https://www.driverfacts.com/driverFACTS.asp

17

1681b(b)(2)(B) and 1681b(b)(3)(B).

In the transportation industry where attrition rates are high, it is critically important for drivers to understand the contents of their consumer files, particularly when the information is almost always provided to a prospective employer. Through the detailed notice process and the receipt of funds sufficient to cover the cost of their consumer reports, Class Members are now armed with sufficient information to guard their personal and professional reputations.

### 2. Society's Stake in Rewarding Attorneys Who Produce Such Benefits

"Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling…claimants to pool their claims and resources" to "achieve a result they could not obtain alone." *In re Telectronics Paging Systems, Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001). Here, Class Counsel helped vindicate the rights of consumers who were unlikely even to know they had claims (due to a lack of mandatory notice), and most of whom had claims too small to pursue on an individualized basis. Thus, Class Counsel's efforts serve precisely the kind of important societal goals envisioned by a consumer class action practice.

In this case, Class Counsel has served this laudable function. In so doing, Class Counsel has helped establish an environment in which compliance with the disclosure requirements of the FCRA is both valued and enforced. This objective serves a valuable specific and general deterrence against non-compliance and serves the function of the private attorney general envisioned by the FCRA.

### 3. Whether the Services Were Undertaken on a Contingent Fee Basis

The burden borne by counsel in taking on the litigation is another relevant factor that justifies Class Counsel's requested award of fees. "Several courts consider the risk of non-recovery the most important factor in the fee determination." *In re Cardinal Health*, *supra*, at 766,

18

*citing In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233-34 (S.D.N.Y. 2005); *Vizcaino*, 290 F.3d at 1050.  As the accompanying declarations of Class Counsel attest, Class Counsel have labored on this case for over two years on a pure contingency basis, and will continue to do so even after final approval.  They advanced all out-of-pocket costs, including mediation costs.  All told, Class Counsel collectively incurred over $23,000.00 in unreimbursed, out-of-pocket costs, all of which were advanced with no promise of repayment.

In large and complex cases like this one, the contingency risk "is very real." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134 (D. N.J. 2002).  While Class Counsel believe strongly in the merits of Plaintiffs' claims, demonstrating liability on the FCRA claims at issue presented a difficult and uncertain outcome.  Because Plaintiffs seek statutory damages, Plaintiffs must establish USX's willful noncompliance with the FCRA. *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-57 (2007) (willful failure to comply can be established by knowing or reckless violation of the statute).  Consequently, absent approval of the settlement, Plaintiffs would be put to challenging proofs and all parties face the prospect of a long and expensive litigation with the real possibility of no recovery at all.

Courts recognize that "the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work." *Garner v. State Farm Mut. Auto Ins. Co.*, No. 08-CV-1365 CW, 2010 WL 1687829, at *2 (N.D. Cal. Apr. 22, 2010) (citing *Vizcaino*, 290 F.3d at 1050).  Contingency fees are accepted in the legal profession "as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose." *In re Washington Pub. Power Supp. Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994); *see also In re Union Carbide Corp. Consumer Prod. Business Sec. Litig.*, 724 F. Supp. 160,

169 (S.D.N.Y. 1989) (noting "[a] large segment of the public might be denied a remedy for violations [of the law] if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken.")

Class counsel also declined other potentially lucrative work in order to take, and continue working on, this suit without knowing whether the case would ever generate any revenue. Pecora Decl. ¶ 11 (Exh. B).

### 4.     The Value of the Services on an Hourly Basis

As described below, Class Counsel spent hundreds of hours prosecuting this litigation and expect to spend hundreds of additional hours after final approval. *See* Declaration of Leonard Bennett and Anthony Pecora (Exh. C and B). Based on Class Counsel's current lodestar, Class Counsel's request would result in a lodestar multiplier after deducting out of pocket expenses would be approximately of approximately 3.5; which will decrease with the inclusion of reasonable estimates for future work associated with this litigation. The lodestar cross-check contemplated by this factor demonstrates that Class Counsel's request is reasonable.

### 5.     The Complexity of the Litigation

The FCRA is not merely a "complex statutory scheme," but one that has been said to contain "almost incomprehensibly complex provisions" and "esoteric strictures." *See Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 440 (D. N.J. 2010); *see also Narog v. Certegy Check Servs.*, 759 F. Supp. 2d 1189, 1194-95 (N.D. Cal. 2011). Further, litigating a case with a Class this large against a sophisticated defendant represented by capable counsel is always complex. The complexity of any FCRA litigation is thus compounded by considerations of a nationwide class, whose interactions with USX could present differing factual scenarios. Additionally, the complexity of the Named Plaintiffs' case was compounded by the risk associated with the

contingent nature of the representation, as discussed above.

### 6. The Professional Skill and Standing of the Attorneys Involved

The benefits of the Settlement were the result of a high degree of skill on the part of Class Counsel. Class Counsel are seasoned practitioners with extensive FCRA litigation experience. *See* Declarations of Leonard Bennett and Anthony Pecora (Exh. C and B). Both Class Counsel and Defense Counsel have been actively engaged in FCRA litigation for many years. *Id.* Class Counsel demonstrated this skill and experience in the efficient prosecution of this class action achieving a valuable settlement without placing further strain on judicial time and resources. *See In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008) ("[t]he ability of Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested.")

To achieve the result they accomplished for the Settlement Class, Class Counsel took on and overcame a series of significant risks. The work that Class Counsel performed began before the case was filed, continues to this day, and will extend beyond the final approval until the last dollar is distributed to the class members (or *cy pres*). Simply put, the work is extensive and top quality.

### F. A Lodestar Cross-Check Confirms the Reasonableness of the Fee.

Although a cross-check is unnecessary where there is no indication that the fee award is out of proportion with the class settlement, counsel is providing further support for the benefit of the Court. Unlike a traditional Rule 54 lodestar application, a "cross-check" is obtained by a rough estimate of time spent and expenses incurred. Manual for Complex Litigation (Fourth) § 21.724 (In common fund cases, judges sometimes request "an estimate of the number of hours spent on the litigation and a statement of the hourly rates for all attorneys and paralegals who worked on

the litigation. Such information can serve as a 'cross-check' on the determination of the percentage of the common fund that should be awarded to counsel."); s*ee, e.g.*, *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 at *2 (noting the "clear trend in the Sixth Circuit" to apply the percentage-of-the-fund method in connection with a lodestar cross-check). A lodestar analysis "multipl[ies] the reasonable number of hours billed by a reasonable billing rate." *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999). "In contrast to employing the lodestar method in full, when using a lodestar cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *In re Cardinal Health*, 528 F. Supp. 2d at 767 (internal quotations omitted).

Here, the lodestar amount of approximately $250,000.00 (without accounting for time anticipated after final approval) combined with multiplier of 3.5 is typical in this district and circuit. *See In re Skelaxin*, 2014 WL 2946459 (noting that multipliers between 3 and 5.9 have been "routinely accepted as fair and reasonable.") In an opinion written on December 6, 2010, Judge Dan Aaron Polster summarized a survey of 1,120 class action cases, which found that the average multiplier used in federal and state courts across the country was 3.89. *See In Re: Oral Sodium Phosphate Solution-Based Prod. Liability Action*, No. MDL 2066, 2010 WL 5058454, at *26 (N.D. Ohio Dec. 6, 2010) (FN 28). Courts nationwide have – many times over – approved multipliers larger than the one Class Counsel requests here, sometimes in cases in which much less work was completed. *See, e.g., In re Charter Commc'n, Inc*., Sec. Litig., No. MDL 1506, 4:02-CV-1186 CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 30, 2005) (approving lodestar multiplier of 5.61); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig*., 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (multiplying lodestar by 4.7 in a case involving review of documents as well as discovery responses that was resolved without taking any depositions and after only two

days of mediation); *In re Rite Aid Corp*. Sec. Litig., 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding lodestar multiplier of 6.96 despite the fact that the parties engaged in mostly informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 362 (S.D.N.Y. 2002) (describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents); *In re NASDAQ Market-Makers Antitrust Litig*., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier and noting that multipliers between 3 and 4.5 have become common); *Di Giacomo v. Plains All Am. Pipeline*, Nos. Civ.A.H-99- 4137, Civ.A.H-99- 4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec. 19, 2001) (endorsing multiplier of 5.3 despite no depositions being taken and most of the discovery was informal or documentary); *see also Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming multiplier of 3.65 to compensate class counsel for risk of taking the case); *Roberts v. Texaco, Inc*., 979 F. Supp. 185, 197-98 (S.D.N.Y. 1997) (approving multiplier of 5.5 in what the court described as risky and hard fought litigation).

### G.  The Requested Service Payment for the Named Plaintiffs is Fair and Reasonable

Generally, it is within the Court's discretion to grant or deny an award of an incentive award.  *See Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir. 2003*); see also In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 535 (E.D. Mich. 2003) (Incentive awards for a named plaintiff are "common in class actions").  The Parties have agreed that Mr. Bell and Mr. Fentress should receive an incentive award of $15,000.00 each deducted from the common fund for their service as the named class representatives.  Not concerned with personal gain, both Mr. Bell and Mr. Fentress participated in the drafting of the pleadings, and they also spent considerable time and effort assisting Class Counsel effectively prosecute this case and ultimately negotiate a

settlement on behalf of over 85,000 individuals not unlike themselves. Indeed, without their participation, the case would never have been filed and relief likely would not have been provided to their fellow Class Members. *See e.g. Physicians of Winter Haven LLC v. Steris Corp.*, 2012 U.S. Dist. LEXIS 15581, 15-16 (N.D. Ohio Feb. 6, 2012) (Baughman, J.) ("Courts within this district, however, have recognized that in common fund cases, and where the settlement agreement provides for incentive awards, class representatives who have had extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled by virtue of class membership alone.")

## IV.  <u>CONCLUSION</u>

The Parties reached a settlement that provides genuine relief to Class Members by providing each class member who submits a valid claim form with a monetary benefit that is above the statutory minimum damage. The terms of the settlement and circumstances surrounding negotiations as well as the finite end to a costly and protracted litigation satisfies the Sixth Circuit's strictures for final approval.

**WHEREFORE**, Named Plaintiffs and the putative class move the Court for an order entering the final approval of this settlement and award the incentive payment, attorney fees and costs as requested herein and as attached hereto.

Respectfully Submitted,

O'TOOLE, MCLAUGHLIN, DOOLEY &
PECORA

By: /s/ Anthony Pecora
    Anthony R. Pecora (0069660)
    Matthew A. Dooley (0081482)
    5455 Detroit Road
    Sheffield Village, Ohio  44054
    Telephone    (440) 930-4001
    Fax:    (440) 934-7208

Email:           mdooley@omdplaw.com
                 apecora@omdplaw.com

and

CONSUMER LITIGATION ASSOCIATES, P.C.
Leonard A. Bennett (Va. Bar No. 27523)
12515 Warwick Boulevard
Newport News, Virginia 23606
Tel:             (757) 930-3660
Fax:             (757) 930-3662
Email:           lenbennett@clalegal.com
*Counsel for Plaintiffs and the putative class*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a copy of the foregoing Motion for Order Granting Final Approval of Class Action Settlement, an Award of Incentive Payments, Attorneys' Fees, and Expenses was filed electronically this 20th day of August, 2014. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or via regular mail.

/s/ Anthony R. Pecora
Anthony Pecora